**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EARL C. MCDANIELS,
          *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,
          *Defendant-Appellee.*

No. 01-2086

RANDOLPH F. LOVETT,
          *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,
          *Defendant-Appellee.*

No. 01-2087

ALTON E. BROWN, JR.,
          *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,
          *Defendant-Appellee.*

No. 01-2088

Appeals from the United States District Court
for the District of South Carolina, at Florence.
C. Weston Houck, District Judge.
(CA-00-1482-4-12, CA-00-2053-4-12, CA-00-2054-4-12)

Argued: May 7, 2002

Decided: July 29, 2002

Before WILKINSON, Chief Judge, and NIEMEYER and
LUTTIG, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Chief Judge Wilkinson joined. Judge Luttig wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Keith Moss Babcock, LEWIS, BABCOCK & HAW-KINS, L.L.P., Columbia, South Carolina, for Appellants. John Berkley Grimball, II, Assistant United States Attorney, Columbia, South Carolina, for Appellee. **ON BRIEF:** James H. Renfrow, Jr., Dillon, South Carolina, for Appellants. J. Strom Thurmond, Jr., United States Attorney, Columbia, South Carolina, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

The Secretary of Agriculture denied the applications of farmers Earl McDaniels, Randolph Lovett, and Alton Brown for livestock disaster relief because each farmer's 1997 gross revenue exceeded $2.5 million, making him ineligible for assistance under applicable Department of Agriculture regulations. In this action, brought under the Administrative Procedure Act, the farmers challenge these regulations, contending that they are arbitrary and capricious because gross revenue is defined to include pass-through funds — in this case, sales of bailment tobacco — in which the farmers had no interest.

The district court held that the applicable regulations were "reasonable and a permissible construction" of the enabling statute and affirmed the Secretary's decision. For the reasons that follow, we affirm the judgment of the district court.

I

In October 1998, Congress established the 1998 Crop Loss Disaster Assistance Program ("CLDAP") and the 1998 Emergency Livestock Feed Assistance Program ("LAP"). To fund these programs, it appro-

priated, as an emergency measure, $1.5 billion to "producers on a farm who have incurred losses in the 1998 crop due to disasters," 1999 Appropriations Act § 1102(b), 112 Stat. 2681, 2681-43, and $200 million "to make available livestock feed assistance to livestock affected by disasters," *id.* § 1103, 112 Stat. at 2681-44.[1] Congress directed that the Secretary of Agriculture distribute the disaster relief in a "fair and equitable manner," *id.* § 1101(a), 112 Stat. at 2681-42, and empowered the Secretary to determine "eligibility and payment limitation criteria," *id.* § 1101(b)(3), 112 Stat. at 2681-42. To "implement" the 1999 Appropriations Act, Congress instructed the Secretary and the Commodity Credit Corporation, "as appropriate," to issue "such regulations as are necessary" "[a]s soon as practicable after the date of enactment." *Id.* § 1133(a), 112 Stat. at 2681-47. In addition, Congress directed that the regulations be promulgated "without regard to the notice and comment provisions of section 553 of title 5, United States Code [the Administrative Procedure Act]." *Id.* § 1133(a)(1), 112 Stat. at 2681-47 (internal subdivision omitted). Congress also provided that any such regulations take effect immediately under 5 U.S.C. § 808, before congressional review is undertaken pursuant to 5 U.S.C. § 801. *Id.* § 1133(b), 112 Stat. at 2681-47.

In accordance with Congress' instructions, the Department of Agriculture issued regulations for the implementation of the 1998 Single-year and Multi-year Crop Loss Disaster Assistance Program and Emergency Livestock Assistance. *See* 7 C.F.R., Parts 1477, 1439. In these regulations, the Secretary defined eligibility criteria for receiving benefits, establishing in particular and as applicable here, the criterion that no person may receive benefits "who has gross revenue in excess of $2.5 million for the 1997 tax year." 7 C.F.R. § 1477.106(f); *see also id.* § 1439.11. Section 1477.106(f) then defines gross revenue as the "total gross receipts of the person," which are not to be reduced "for costs, expenses or pass-through funds." And "pass-through funds" are defined as money "that goes through, but does not remain in, a person's account, such as money collected by an auction house."

---

[1] These programs were established and funded as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277 (Oct. 21, 1998), 112 Stat. 2681 *et seq.*, 7 U.S.C. § 1421 note (2000) (referred to in this opinion as the "1999 Appropriations Act").

*Id.* § 1477.103. Finally, the regulation specifies that persons who receive "50 percent or less of [their] gross receipts from farming and ranching" may still receive assistance, but only if their 1997 gross revenue "from all sources" was less than $2.5 million. *Id.* § 1477.106(f).

II

Earl McDaniels, Randolph Lovett, and Alton Brown are farmers in South Carolina who derive less than 50% of their income from farming. Each, however, suffered losses in his South Carolina farming operations and therefore applied to the Farm Service Agency ("FSA") of the Department of Agriculture for livestock disaster assistance under the CLDAP and the LAP. The FSA administers the distribution of benefits for disaster assistance on behalf of the Department of Agriculture. As these farmers received less than 50% of their gross income from farming and ranching, their eligibility for assistance depended on whether their total 1997 gross revenue "*from all sources*" was less than $2.5 million. Because each farmer had gross revenue that exceeded $2.5 million, when pass-through funds from tobacco auctions at warehouses in which they had an interest were included, the FSA denied the farmers benefits.

McDaniels owned a one-third partnership interest in New Tabor Warehouse, located in Tabor City, North Carolina. The 1997 sales for New Tabor Warehouse were more than $10 million (6 million pounds of tobacco at $1.68 per pound). Lovett owned a two-thirds interest in the stock of Big L Warehouse, Inc., a sub-chapter S corporation, which owned and operated a tobacco warehouse in Mullins, South Carolina. The 1997 sales for Big L Warehouse totaled $10.7 million. And Brown owned 100% of the stock of Brown Brothers Warehouse, Inc., which operated a tobacco warehouse located in Kingstree, South Carolina. The 1997 sales for Brown Brothers Tobacco Warehouse totaled $3.3 million (approximately 2 million pounds of tobacco at $1.68 per pound).

Some of the tobacco auctioned at each of these warehouses was owned by the warehouse owners, but most was owned by other producers, who stored their tobacco at and auctioned it from the warehouse under a bailment arrangement. Proceeds from the auction sales

of tobacco were paid by the purchasers to the tobacco warehouses and deposited in the warehouses' bank accounts. In the case of McDaniels, the purchasers paid the warehouse partnership which, after retaining sales commissions, distributed the net proceeds to the tobacco owners. In the case of the Big L and Brown Brothers warehouses, the warehouse owners advanced the purchase price to the tobacco owners and then billed the purchasers for the advance plus a sales commission. But in all cases, the proceeds of the auction sales of bailment tobacco passed through the warehouses' bank accounts.

The FSA determined that each of the farmers' gross revenue, including the receipts from auction sales at the tobacco warehouses, exceeded $2.5 million and therefore denied the farmers' applications for benefits. The farmers appealed the FSA's rulings to the Department of Agriculture's National Appeals Division, asserting in particular that because they never took title to the bailment tobacco sold from their warehouses on behalf of third party producers, it was erroneous to treat the proceeds of bailment tobacco as revenue. Following separate evidentiary hearings, the National Appeals Division affirmed the FSA's determinations. Finally, the Director Review Determinations affirmed the appellate decisions.

After exhausting their administrative remedies, the farmers filed separate complaints in the district court for judicial review of the agency's final decisions, pursuant to the Administrative Procedure Act. The district court upheld the agency determinations, concluding that the Secretary properly applied the applicable regulations in denying the farmers' request for relief. The court noted that 7 C.F.R. § 1477.106(f) dictates the inclusion in gross revenue of the tobacco warehouse sales, including pass-through funds. Because each farmer's gross revenue from those sales, as defined by the regulation, exceeded $2.5 million, the court concluded that the Secretary properly denied relief. On the farmers' challenge to the regulations themselves, based on their inclusion of pass-through funds as part of gross revenue, the court held that the Secretary's regulations were reasonable and "a permissible construction of the 1998 Act."

These appeals followed, and, because each farmer presents the same issue, they have been consolidated.

### III

The farmers agree that a proper application of the regulations required the Secretary to deny them disaster assistance because each had gross revenue in excess of $2.5 million when including the pass-through funds realized from auction sales of bailment tobacco. They contend, however, that the regulations themselves exceed the Secretary's statutory authority, which requires the Secretary to distribute the benefits in a "fair and equitable manner." They also contend that the regulations are unreasonable, arbitrary, and capricious because they include, as a component of gross revenue, pass-through funds for bailment tobacco sales even though the farmers "neither owned title to the tobacco nor had a right to the proceeds from the bailment sales." They point out that the Secretary provided no explanation of why such funds were included in gross revenue. The farmers assert that, but for the inclusion of pass-through funds, they would have qualified for disaster assistance.

We therefore must determine whether the Secretary acted reasonably and in accordance with his authority when he adopted regulations, basing eligibility for the 1998 disaster relief funds on gross revenue that included pass-through funds.

"[W]hen it appears that Congress delegated authority to [an] agency generally to make rules carrying the force of law," we give great deference to an "administrative implementation of [the] particular statutory provision." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). And in determining whether the agency acted within the scope of its power, we are "confronted with two questions." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Id.* at 842-43. Even if Congress' intent is ambiguous, we defer to the agency's construction of the statute, asking only "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. At bottom, when Congress delegates "authority to the agency to elucidate a specific provision of [a] statute by regulation[,] [s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or

manifestly contrary to the statute." *Id.* at 843-44; *see also Mead*, 533 U.S. at 227.

In this case, we cannot imagine how Congress could have been more clear in its delegation of authority to the Secretary. In enacting the 1999 Appropriations Act, Congress gave the Secretary instructions to distribute the appropriated disaster relief funds in a "fair and equitable manner . . . in all affected geographic regions of the United States," 1999 Appropriations Act § 1101(a), 112 Stat. at 2681-42, and authorized the Secretary to determine "eligibility and payment limitation criteria," *id.* § 1101(b)(3), 112 Stat. at 2681-42. Congress appropriated the money on an emergency basis and directed that regulations be promulgated as soon as practicable, bypassing public notice and comment, as well as prior congressional review. *Id.* § 1133, 112 Stat. at 2681-47.

Acting within these broad criteria to distribute the limited funds available, the Secretary narrowed the class of persons eligible by adopting the uniform and objective criterion of gross revenue, determining that $2.5 million in gross revenue was the cutoff point for disaster relief under these programs. Without adopting complex administrative criteria for determining what might constitute other measures of economic strength, such as net revenue or net income — undoubtedly recognizing the bureaucratic delay that would ensue — the Secretary adopted a gross revenue criterion and defined gross revenue simply to be gross receipts without any adjustments:

> Gross revenue includes the total income and total gross receipts of the person, before any reductions. Gross revenue shall not be adjusted, amended, discounted, netted or modified for any reason. No deductions for costs, expenses or pass-through funds will be deducted from any calculation of gross revenue.

7 C.F.R. § 1477.106(f). The adoption of this qualifying criterion for entitlement to relief clearly falls within the statutory authorization to the Secretary to determine "eligibility criteria." Because the regulations were a direct response to Congress' express grant of legislative authority, we must give the regulations controlling weight.

The farmers argue that the regulations should not be given controlling weight because the eligibility criteria chosen are "arbitrary, capricious, or manifestly contrary to the statute" in that they do not meet the statutory requirement of being "fair and equitable" and because the Secretary, in promulgating the regulations, did not provide an explanation for the eligibility criteria.

But Congress expressly provided that the Secretary need not provide an explanation for eligibility criteria. In the 1999 Appropriations Act, Congress authorized the Secretary to promulgate regulations without regard to the notice and comment requirements of the Administrative Procedure Act ("APA"). Thus, the Secretary was not required to explain his reasoning. *See* 5 U.S.C. § 553(c) (requiring "a concise general statement of [a regulation's] basis and purpose" *only* "[a]fter consideration of the relevant matter presented" during the comment period). The only limitation on the Secretary's authority, therefore, was that it had to be exercised in a reasonable manner. *See Chevron*, 467 U.S. at 845 (stating that, where Congress does not specify an intent with regard to how an agency should exercise its discretion, the question before a reviewing court is whether the agency's action was reasonable).[2]

---

[2]Our dissenting colleague has overlooked Congress' expressed intent to enact the 1999 Appropriations Act as an emergency matter, without notice and comment, and to give the agency broad discretion on how to distribute the appropriated assistance. When Congress exempts an agency from the APA's requirement of providing a rationale for its regulation and does not specify how the authorized discretion is to be exercised, our review is whether the agency's regulation is reasonable, *see Chevron*, 467 U.S. at 845, a review not unlike the evaluation of a statute's constitutionality under the traditional rational basis review. *See also Motor Vehicle Manuf. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43-44 (1983) (noting Congress' express requirement of a record of the agency's rulemaking proceedings as relevant to the conclusion that the agency had not articulated a sufficient explanation for its action).

Any inquiry, therefore, into the rationality of the rule examines the rule itself to determine whether any reasonable basis can support it; it does not speculate on the rule's application. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984) (holding that as long

Even though reasonable minds might differ as to whether eligibility criteria based on gross revenue — as distinct from net income, assets, or net worth — were the best choice to measure a farmer's economic strength and therefore need for relief, there can be no doubt that the basis chosen for eligibility was reasonable. Gross revenue is an economic measure of the size of a farmer's operations, just as are net income, assets, and net worth. While gross revenue may overstate the size of an operation because its net income may be only a small portion, net income could be just as imprecise, failing to identify a large operation that is managed poorly or in which substantial individual incomes are sheltered as items of cost. There is no doubt that more precise definitions of economic strength could be made, but with more precise definitions come the disputes over appropriate accounting methods and other similar issues.

The choice of measuring a farmer's economic strength by gross revenue can rationally be justified as a way to "allow relief to be made available quickly, and effectively, within the limits of the funding available for this program." 64 Fed. Reg. 18553, 18554 (Apr. 15, 1999). Using gross revenue as the basis for eligibility eases the administrative burden of calculating each farmer's income. Lumping pass-through funds with revenue reduces the likelihood of sellers manipulating the structure of their transactions to convert non-deductible costs of goods sold into deductible pass-through funds. And, as perhaps the most objective criterion available, it avoids the possibility of inefficient farmers benefiting more than efficient ones,

---

as "a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of" the promulgating entity); *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911) (holding that under rationality review, a law should be invalidated only where it lacks "any reasonable basis and therefore is purely arbitrary"). And in determining whether a reasonable basis for the rule exists, we need not determine whether that basis is the actual reason for which the rule was passed. *See, e.g.*, *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision'" (quoting *Flemming v. Nestor*, 363 U.S. 603, 612 (1960))).

as well as the potential for manipulating income through creative accounting.

In sum, we conclude that the selection of a gross revenue criterion without deductions of any kind, including pass-through funds, was a rational application of the Secretary's authority to distribute funds in a fair and equitable manner.

Accordingly, we affirm the judgment of the district court.

*AFFIRMED*

LUTTIG, Circuit Judge, dissenting:

The majority's speculation as to the rationales that might have underlay the Department of Agriculture regulation (on the strength of which it then upholds the regulation) constitutes yeoman's work. It is even possible that these speculated reasons were in fact the reasons that the Department promulgated the regulation. But the jurisprudential insight that eludes the majority is that it just may well be that these were not the reasons that prompted the agency's regulation that we review today. I do not know the reasons for the agency's inclusion of pass-through funds in gross revenue, and neither does the majority, for *no* reasons for that decision have been provided by the agency, either in the course of the regulation's promulgation or in the course of this litigation. It is in this very circumstance that the Supreme Court has cautioned the courts against their own post hoc supply of reasons for agency action and explained that the proper procedure is, instead, for the courts to require of the agency that it explain its own action, after which meaningful judicial review may then be had. I would heed the Supreme Court's warning and hew to its mandated procedure in this case. Accordingly, I dissent.

That an agency must give some statement of explanation for its actions is a basic precept of administrative law. As the Supreme Court admonished in *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational

connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines* v. *United States*, 371 U.S. 156, 168 (1962)). The reasons provided by the agency are the only basis on which the agency's actions may be upheld. *See State Farm*, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). As the Court explicitly warned in *State Farm*, reviewing courts are not to rely on reasons that the agency itself has not provided: "More importantly, it is the agency's responsibility, not this Court's, to explain its decision." *Id.* at 57.

From these premises, it follows (at least as a general matter) that if an agency has provided no reasons for its action, a court may not uphold that action. That is, if the Supreme Court is willing to remand to the agency on the basis of unconvincing reasons, as it did in *State Farm*, it follows *a fortiori* that agency action for which no justification at all is provided, likewise, cannot be sustained. *See SEC* v. *Chenery Corp.*, 332 U.S. 194, 196 (1947) ("The rule is to the effect that a reviewing court . . . must judge the propriety of such [agency] action solely by the grounds invoked by the agency. If those grounds are *inadequate* or improper, *the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.*" (emphasis added)).

The majority attempts to relieve the Department of its obligation to provide an explanation, but this attempt results in yet another misapplication of law. The majority concludes that because the 1999 Appropriations Act exempts the Secretary from the notice and comment requirements of section 553(c) of the Administrative Procedure Act (APA), *see* 1999 Appropriations Act § 1133(a)(1), 112 Stat. 2681, 2681-47, the agency was not required to give reasons for its decision to include pass-through funds in gross revenue. *See ante* at 8. However, even assuming that, *under section 553(c)*, a statement of basis and purpose is required only if notice and comment is mandated — a conclusion, incidentally, not required by the text of that provision — it does not follow (as the majority believes it does) that the agency's decision may be upheld in the absence of any stated justification. *The Secretary still must provide reasons for his decision in order to survive arbitrary and capricious review under section 706(2)(A) of the APA.*

The Supreme Court has sensibly treated section 706, of its own force, as requiring the agency to provide explanation for its action, *see Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402, 416 (1971); *see also Pension Benefit Guar. Corp.* v. *LTV Corp.*, 496 U.S. 633, 654 (1990), reasoning that unexplained action is, by definition, arbitrary and capricious. And, per the direct authority of *Overton Park*, this is so even in cases where an agency is not required to make formal findings or observe the notice and comment requirement before it takes action, because, absent agency explanation, a reviewing court is unable to determine "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416. Therefore, as the Supreme Court has held, the proper approach under section 706 is not, as the majority does here, for the courts to speculate post hoc as to what the agency's reasoning might have been, but, rather, for the agency itself to explain post hoc what the reasons for its action actually were. *See id.* at 420-21.

By positing reasons for the Secretary's action, the majority has, pure and simple, (mis)equated arbitrary and capricious review with minimum rationality review, in contravention of the Supreme Court's clear instruction in *State Farm*, that "the presumption of constitutionality afforded legislation drafted by Congress and the presumption of regularity afforded an agency in fulfilling its statutory mandate" are not "equivalent." *See State Farm*, 463 U.S. at 43 n.9. The Supreme Court only recently reaffirmed this principle, of which the majority stands in violation, in *Bowen* v. *American Hospital Association*, 476 U.S. 610 (1986) (plurality opinion). After quoting the above noted language from *State Farm*, the Court went on to explain that "the mere fact that there is 'some rational basis within the knowledge and experience of the [regulators]' under which they 'might have concluded' that the regulation was necessary to discharge their statutorily authorized mission will not suffice to validate agency decisionmaking." *Id.* at 627 (internal citations omitted). Said the Court, in a passage that represents an anticipated rejection of today's decision by the majority, "[a]gency deference has not come so far that we [the Supreme Court] will uphold regulations whenever it is possible to 'conceive a basis' for administrative action." *Id.* at 626.

In light of the complete absence of any agency explanation for its inclusion of pass-through funds in the calculation of gross revenue,

I would, as required by Supreme Court precedent, remand to the Department for a statement of its reasons for this inclusion, a disposition that would thereafter permit meaningful judicial review. "[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co.* v. *Lorion*, 470 U.S. 729, 744 (1985). Unlike the majority, I am unwilling to speculate as to the reasons for the agency's decision. I believe it is as unacceptable for a court to generate its own reasons for agency action, as it is to substitute its own views for those of the agency as to the propriety of particular action. The former, which the majority has indulged in here, may seem a comparatively trivial limitation on the judicial power, but it is not. It goes just as much to the legitimacy of the judicial process and the independence of the executive process as does the latter. *See Chenery Corp.*, 332 U.S. at 196 (noting that for a court to uphold agency action where the agency has not provided sufficient reasons "would propel the court into the domain which Congress has set aside exclusively for the administrative agency").

For these reasons, I respectfully dissent.