PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DANIEL WORDEN,

   *Plaintiff-Appellant,*

   v.

SUNTRUST BANKS, INCORPORATED,

   *Defendant-Appellee.*

No. 07-1354

Appeal from the United States District Court
for the District of South Carolina, at Anderson.
G. Ross Anderson, Jr., District Judge.
(8:06-cv-01074-GRA)

Argued: September 23, 2008

Decided: November 24, 2008

Before MOTZ and AGEE, Circuit Judges, and
James C. CACHERIS, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

Affirmed in part, reversed in part, and remanded by published
opinion. Judge Agee wrote the opinion, in which Judge Motz
and Senior Judge Cacheris joined.

## COUNSEL

Mary Christine McCormac, Clemson, South Carolina, for
Appellant. Cara Yates Crotty, CONSTANGY, BROOKS &
SMITH, Columbia, South Carolina, for Appellee.

**OPINION**

AGEE, Circuit Judge:

Daniel Worden brought this civil action against his former employer, SunTrust Banks, Inc. ("SunTrust"), alleging that SunTrust violated two provisions of the Employee Polygraph Protection Act ("EPPA"), 29 U.S.C. §§ 2001 to 2009 (2000). The district court granted SunTrust's motion for summary judgment as to both claims. For the reasons that follow, we affirm in part, reverse in part, and remand the judgment of the district court.

I.

Daniel Worden worked at an Anderson County, South Carolina, branch bank of SunTrust ("the Anderson branch"). On the morning of August 11, 2005, the Anderson branch received a telephone call from Worden, who claimed that two men had kidnapped him in order to rob the bank. Worden asked his co-worker to open the vault of the bank, but the co-worker refused and instructed another employee to telephone the Anderson County police. Worden's telephone call was then disconnected.

At approximately the same time the Anderson County police received the telephone call from the bank, they also received a telephone call from Worden, who stated that he had been kidnapped and forced to participate in a bank robbery attempt. According to Worden, on the evening of August 10, 2005, he was held in his home overnight at gunpoint by two individuals who wanted to use him to rob the Anderson branch. Worden stated the men told him they would kill him if he refused to cooperate, and so he did as they instructed. He claimed he was held and questioned by the kidnappers until they were ready to leave the next morning. He stated that when his roommate and the roommate's new wife ("the Tyases") arrived at his home, the kidnappers tied them up in

a different room. Worden claimed the kidnappers abandoned him "in the woods" when they realized their plan had failed.

At some point later on August 11, 2005, Worden spoke by telephone with Kevin Brock, the SunTrust area manager who supervised the Anderson branch. Worden asked Brock to help him with several personal matters he had been unable to address and to come to the police station, where Worden had gone to provide a statement of events.

Later the same day, Detective John Zamberlin, one of the Anderson County police investigators on the case, informed Worden that law enforcement suspected he was behind the attempted robbery. He requested and received Worden's consent to administer a polygraph examination. No one from SunTrust requested, participated in or was present during Worden's polygraph examination.

As requested by Worden, Brock was still at the police station when the polygraph examination was administered. Brock was joined by Loretta Rohrer-Norris, SunTrust's regional security manager. At some point, Zamberlin informed Brock and Rohrer-Norris that they suspected Worden and his roommate were involved in the attempted robbery, and that Worden had agreed to take a polygraph examination. While they were all discussing the incident, the polygraph examiner entered the room and announced that Worden had failed the exam. The examiner also apparently spontaneously stated that a second exam would be appropriate because the results of the first exam might be challenged as inconclusive because the traumatic experience was so recent in time.[1]

The next morning, Brock spoke with his supervisor, Kent Dill, the retail line of business manager, about the progress of

---

[1]Neither Brock nor Rohrer-Norris saw a written report of the polygraph exam, nor did they ask for a copy of it.

the investigation. During their discussion, Brock mentioned Worden had failed the polygraph examination. At some point over the next week, Brock also informed Charles A. Perry, the regional president, that Worden had failed the polygraph examination.

In addition to the Anderson County police, the Federal Bureau of Investigation ("FBI") was also investigating the incident. As part of their investigation, the FBI initiated and administered a second polygraph examination on August 17, 2005, in Greenville, South Carolina. Once again, Worden consented to the examination. As with the first polygraph examination, SunTrust neither requested nor participated in its administration. Upon the completion of the exam, the FBI informed Worden that the results indicated "deception," and that they still considered him to be a suspect.

After the examination was over, Zamberlin telephoned Brock to request that he drive Worden back to Anderson. Zamberlin, apparently unsolicited, also told Brock that Worden had "failed [the second polygraph examination] miserably." Brock went to Greenville to pick up Worden and while driving him back to Anderson, Worden told Brock that he failed the second polygraph exam.[2]

Within a day of the second polygraph examination, Brock informed Dill that Worden was still considered a suspect and had failed another polygraph examination. As the investigation continued, law enforcement personnel apprised Brock and Rohrer-Norris of their progress, and the fact that Worden was their prime suspect and that he would likely be charged with the crime.[3] Brock and Rohrer-Norris communicated that information to their supervisors, Dill and Perry.

---

[2]Rohrer-Norris also learned of the results of the second polygraph examination from the FBI during a conversation regarding the attempted robbery investigation.

[3]Zamberlin's affidavit in the record states, "[a]s soon as the investigation began, we learned of several facts that immediately raised 'red flags,'

Dill and Perry concluded Worden was not a trustworthy employee and should not be in a position to handle depositors' money. They decided to terminate Worden's employment, but delayed any action on the termination at the request of law enforcement so as not to impact the investigation. Perry and Dill both stated that although they were aware of the polygraph results, based on the complete information in their possession, SunTrust "still would have made the decision" to terminate Worden even if he had passed the polygraph examinations or if they were not aware of the negative results. Perry indicated the only time he mentioned the polygraph results was in a conversation with Mindy Schwartz, the senior regional human resources representative, in the context of discussing the reasons law enforcement suspected Worden.

On September 1, 2005, Brock informed Worden of the decision to terminate his employment. Brock expressed the concerns SunTrust had based on law enforcement's ongoing belief that Worden was involved in the attempted bank robbery, but did not mention the polygraph examinations.[4]

---

or made us suspicious of Mr. Worden's possible involvement in the crime." Zamberlin cited the following factors leading to their suspicion: the length and detail of Worden's statement, a former employer's belief that Worden was stealing merchandise from him and had quit before being discovered, Worden's neighbor was not home the night of the kidnapping and no one in the neighborhood observed anything suspicious, the hole by which Worden claimed the kidnappers entered his apartment had not been cut from the outside, Worden's description of the kidnappers' behavior was unusual, Worden's "oddly unemotional" response to the kidnapping and to being accused of being involved in the crime, the kidnappers' use of materials from inside Worden's duplex to bind Worden and the Tyases, Worden's refusal to turn over his home computer for processing, inconsistencies in Worden's statement and those provided by the Tyases, Worden's claim that the kidnappers left with Worden around 4 a.m. to commit a crime that was not attempted until 9 a.m., and the kidnappers' inside knowledge of the bank and the lack of any other suspects within the Anderson branch.

[4]SunTrust also summarized the incident leading to Worden's termination in its standard internal "termination reason form," which describes the incident leading to his termination as follows:

In March 2006, Worden timely filed a complaint against SunTrust alleging two violations of the EPPA. First, Worden asserted SunTrust "used, accepted, referred to, obtained, learned of, and/or inquired concerning the results of the polygraph examination," in violation of 29 U.S.C. § 2002(2) (the "§ 2002(2) claim"). Second, Worden asserted SunTrust fired him "based on the results of the polygraph examination," in violation of 29 U.S.C. § 2002(3) (the "§ 2002(3) claim").

Both parties moved for summary judgment. After hearing oral argument, the district court granted SunTrust's motion. Noting the paucity of EPPA case law, the district court first held that § 2002(3) "does not prohibit the discharge of an employee if polygraph results are 'a factor' in the decision, so long as they are not the sole factor.'"[5] It then found the "undisputed evidence" in the case at bar demonstrated that "no reasonable person could conclude the polygraph results were the sole reason for [Worden's] discharge." *Worden v. SunTrust Banks, Inc.*, 8:06-cv-1074-GRA, slip op. at 8-9 (D.S.C. March 22, 2007). In addition, the district court determined the record "unequivocally establishe[d]" that SunTrust "would have made the same decision [to terminate Worden] even if law enforcement (and [Worden]) had not disclosed the results to SunTrust." *Id.* at 11. In so holding, the district court relied

---

On 8/11/05, a kidnapping and attempted robbery occurred with the [Anderson branch. Worden] called into the [branch] and said he was kidnapped and the kidnappers wanted money. The Anderson County police department [is] involved and have an ongoing investigation. Daniel was heavily questioned and has had 2 inconclusive polygraph tests. He has not been told he is a suspect however due to the possible involvem[ent] with this crime against the bank, we ended his employment on 9/1/05.

[5]In so doing, the district court specifically rejected the approach taken in *Mennen v. Easter Stores*, 951 F. Supp. 838 (N.D. Iowa 1997), where the court "decline[d] the opportunity to 'assume' that an employer . . . can take adverse employment action against an employee, so long as the polygraph results are not the *sole* basis for its decision." *Id.* at 855.

on the statements of Dill and Perry, the individuals with authority to terminate Worden's employment, and SunTrust's evidence that it had discharged "at least one other employee under virtually identical circumstances – with the notable exception that the employee had not taken or been asked to take a polygraph." *Id.* at 11.

The district court then analyzed Worden's § 2002(2) claim. It "decline[d] to hold [SunTrust] liable for the mere knowledge of [Worden's] lie detector results where it never asked for that information or had the opportunity to decline it and where [Worden] himself informed it of the polygraph results." *Id.* at 15. The district court determined Worden's assertion that SunTrust unlawfully "used" the polygraph examination results was "completely duplicative" of his wrongful discharge claim. It therefore concluded SunTrust did not "use" the polygraph results for § 2002(2) purposes because those results "were not the sole or determinative factor in the discharge decision." *Id.* The district court further held SunTrust did not "refer to" the results of the polygraph examinations because it would be "nonsensical" to hold SunTrust liable for "referring to" information Worden provided to it. *Id.* at 19. It noted that even if SunTrust had impermissibly used or referred to the polygraph examination results, "the point is moot because the ultimate outcome would not be any different" because SunTrust would have discharged Worden "even without knowledge of the polygraph results." *Id.* at 20.

The district court also held SunTrust did not "accept" the results of Worden's polygraph examinations for purposes of § 2002(2). It concluded that both the definition and statutory context of the word "accept" required an employer to do more than passively receive information. Accordingly, it found SunTrust had not "accepted" the polygraph results because law enforcement first informed SunTrust of the results "through no fault of" SunTrust's, and then Worden "unilaterally forced knowledge of the polygraph results upon" it. *Id.* at 15, 19. In reaching this decision, the district court held that

the Department of Labor ("DOL") regulation, 29 C.F.R. § 801.4(c), making it unlawful for an employer to receive the results of a polygraph test administered by police authorities was "beyond the scope of the authority granted by Congress and [was] irreconcilable with the express terms of the EPPA." *Id.* at 16-17.

Worden noted a timely appeal. We have jurisdiction under 28 U.S.C. § 1291 (2000).

## II.

We review the district court's grant of summary judgment de novo. *Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 283 (4th Cir. 2004) (en banc) (internal quotation marks omitted). We construe the evidence in the light most favorable to Worden, the party opposing SunTrust's motion, and draw all reasonable inferences in his favor. *See id.*

## III.

Worden appeals the district court's grant of summary judgment as to both of his EPPA claims. Under § 2002(2), it is unlawful for an employer "to use, accept, refer to, or inquire concerning the results of any lie detector test of any employee or prospective employee." Under § 2002(3), it is unlawful for an employer "to discharge . . . any employee . . . on the basis of the results of any lie detector test." In view of the district court's stated basis to award summary judgment to SunTrust on the § 2002(2) claim, we will first review the award of summary judgment on the § 2002(3) claim.

A.

Worden asserts the district court erred in holding that an employer can only be liable under § 2002(3) if the polygraph examination results are the employer's "sole factor" for termination or other adverse employment action regarding an employee. In addition, he contends summary judgment was inappropriate because a genuine issue of material fact exists regarding whether SunTrust would have terminated Worden even if it had not known of the polygraph examination results.

The district court appears to have blended two different grounds in its analysis of the § 2002(3) claim. First, it determined the statute did not prohibit employers from discharging an employee as a result of polygraph examination results as long as the results were not the "sole factor" for the decision. Separately, the district court reviewed the evidence and held that the record "unequivocally establishe[d]" that SunTrust "would have made the same decision even if law enforcement (and [Worden]) had not disclosed the results to SunTrust."

To the extent the district court interpreted § 2002(3) to require "discharge . . . on the basis of" the results of a polygraph examination as the sole factor for the employment-related decision, we reject that interpretation.[6] The language of § 2002(3) is plain and straightforward: it is unlawful for an employer "to discharge . . . any employee . . . on the basis of the results of any lie detector test." Reading the statute so as to require the results of the polygraph examination to be the "sole" basis of that decision would require adding words to the statute, a task in the province of the legislature and not the judiciary. *See Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 111 (4th Cir. 2006) (refusing to "venture beyond the confines of the statutory language" because "Congress says in a

---

[6]Conversely, if an employer's termination of employment is solely on the basis of the results of a polygraph exam, liability under § 2002(3) is axiomatic unless one of the EPPA exceptions applies.

statute what it means and means in a statute what it says" (internal quotation marks omitted)). On its face, § 2002(3) does not require polygraph results to be the "sole" basis of an employment decision and we cannot read the statute otherwise.

Therefore, a plaintiff is only required to show that the results of the polygraph examination were a factor in the termination of employment as part of establishing a prima facie case under § 2002(3). Even upon such a showing, however, a plaintiff does not necessarily succeed on an EPPA claim of unlawful discharge. There are certain exceptions to liability under § 2006 of the EPPA. One is a limited exemption for ongoing investigations, which provides that an employer is permitted to request an employee submit to a polygraph test if "the test is administered in connection with an ongoing investigation involving economic loss or injury to the employer's business," "the employee had access to the property that is the subject of the investigation," "the employer has a reasonable suspicion that the employee was involved in the incident or activity under investigation," and the employer executes a statement including certain information, which is provided to the employee before the test is administered. § 2006(d). SunTrust does not contend this or any other EPPA exemption applies, but that because its motive in terminating Worden's employment was unrelated to the polygraph examination and would have occurred in any event, it cannot be liable under § 2002(3).

There are two traditional approaches to analyzing employment discrimination claims, historically referred to as the "pretext" and "mixed-motive" frameworks. *Hill*, 354 F.3d at 284-85. Under the "pretext" model established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1975), a plaintiff is obligated to first establish direct or circumstantial evidence of discrimination. If the plaintiff makes such a showing, the defendant must respond with evidence that it acted on a legitimate, non-discriminatory basis. If the defendant does so, the

plaintiff is then obliged to present evidence to prove that the defendant's articulated reasons were a pretext for unlawful discrimination. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). Alternatively, under the "mixed-motive" framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality opinion), a plaintiff must first offer evidence of discrimination.[7] Once the plaintiff has made a prima facie case, the employer can avoid liability by proving that it would have made the same decision in the absence of the discriminatory motivation. *Id.* at 258 (plurality opinion); *id.* at 259-60 (White, J., concurring); *id.* at 276-77 (O'Connor, J., concurring).

---

[7]Because *Price Waterhouse* was a plurality decision, an ongoing issue after it was decided was what level of proof a plaintiff must provide to set forth his prima facie case. This Circuit has followed Justice O'Connor's concurring opinion in *Price Waterhouse*, which required plaintiffs to present "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995) (quoting *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring)), *abrogated by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003). In *Desert Palace*, the Supreme Court held that the 1991 statutory changes make it unnecessary to provide direct evidence of discrimination in Title VII mixed-motive cases. 539 U.S. at 101-02.

Although this Court has acknowledged the question in other instances in which it has applied *Price Waterhouse*'s mixed-motive analysis, it has not needed to resolve the issue. *E.g.*, *EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 163 n.1 (4th Cir. 2004) ("We have previously assumed, without deciding, that direct evidence is still a prerequisite for a mixed-motive analysis in ADEA cases. . . . We are not called on to decide that issue because the EEOC has presented direct evidence of discrimination—namely, [testimony] and journal entries regarding [the employer's] alleged discriminatory statements").

At a minimum, to pursue a mixed-motive case, a plaintiff must demonstrate that a "protected trait . . . actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Hill*, 354 F.3d at 286 (internal quotation marks omitted). In view of our resolution of the § 2002(3) claim, it is unnecessary in this case to determine what level of proof would be required to proceed under the mixed-motive analysis.

Through the Civil Rights Act of 1991, Congress eliminated an employer's ability to avoid all liability in some Title VII cases. 42 U.S.C. § 2000e-2(m); *see Hill*, 354 F.3d at 284. However, courts have continued to apply the *Price Waterhouse* mixed-motive analysis in other employment discrimination contexts where Congress has not subsequently acted. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 95 (2003). For example, this Court has applied *Price Waterhouse*'s mixed-motive analysis in the context of claims brought under the Age Discrimination in Employment Act, *see EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 164 n.2 (4th Cir. 2004), Title VII retaliation claims, *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 552 n.7 (4th Cir. 1999), and claims under the Uniformed Services Employment and Reemployment Rights Act of 1994. *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 314-15 (4th Cir. 2001); *see also Williams v. Fermenta Animal Health Co.*, 984 F.2d 261, 265 (8th Cir. 1993) (permitting equivalent of a mixed-motive jury instruction in a claim under 42 U.S.C. § 1981). Application of the mixed-motive analysis to claims under the EPPA thus seems logical and appropriate, as the case at bar well illustrates.

The record clearly shows that SunTrust was aware of the results of Worden's two polygraph examinations. For this reason, we will assume, without deciding, that he has shown that those results were a factor in the decision to terminate his employment. Even so, and as the district court found, the record unequivocally shows that SunTrust would have terminated Worden even if it had not known the results of the polygraph examinations.

Contrary to Worden's argument on appeal, the evidence falls short of creating any genuine issues of material fact on this issue. The parties filed cross motions for summary judgment, both representing to the district court that there were no genuine issues of material fact remaining for trial, except for damages. In one section of his response to SunTrust's motion for summary judgment, Worden argued summary judgment

based on a mixed-motive theory was inappropriate because the district court would be required to make "credibility determinations" and "decid[e] numerous issues of material fact" regarding SunTrust's reasons for terminating him. Worden suggests the record contains "contradictions" and he questions the "suspicious" timing of Worden's departure. However, he did not point to any specific facts in the record that created a question of fact as to whether SunTrust's stated reasons for terminating his employment were its actual reasons for doing so. (R. 24). Worden is just as imprecise in his argument on appeal.

The evidence in the record overwhelmingly supports the district court's conclusion that SunTrust would have discharged Worden even without knowing the results of the polygraph examination. Specifically, Dill and Perry, the two individuals who made the decision to discharge Worden, both testified that Worden's employment was terminated because they lost trust in him due to his probable involvement in the attempted robbery. They unequivocally testified that Worden would have been fired even if they had no knowledge of the results of the polygraph examinations. This testimony is not contradicted, and manifestly shows that SunTrust "would have made the same decision in the absence of" knowing the results of the polygraph examination.

Perry and Dill also testified, without contradiction, that in making their employment decision, they relied on the statements of law enforcement officers that Worden was suspected of involvement in the attempted robbery. Nothing in the record, or alleged by Worden, challenges their bona fide reliance on the statements from law enforcement as to Worden's complicity. In addition, SunTrust provided information showing that it terminated another employee who law enforcement suspected in an unrelated criminal investigation, even though the evidence was circumstantial, authorities had not pressed charges against the employee, and the employee had not taken a polygraph examination.

Worden contends several of Brock's prior statements indicate that he was fired because of the polygraph examination results. However, the record is clear that Perry and Dill were the two individuals who had the authority and made the decision to terminate Worden. Brock was not part of their discussions, nor did he act independently. Accordingly, his statements do not create a genuine issue of material fact. *See Hill*, 354 F.3d at 288, 291 ("an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision").

Because the record plainly shows that SunTrust would have terminated Worden's employment even if it had not had knowledge of the polygraph examination results, we hold that SunTrust met the *Price Waterhouse* standard for avoiding liability on Worden's claim of unlawful termination. As there was no genuine issue of material fact left before the district court on this issue, it did not err in granting SunTrust summary judgment on the § 2002(3) claim.

### B.

Worden contends the district court did err by granting summary judgment on his § 2002(2) claim because, in his view, SunTrust used, accepted, and referred to the polygraph examination results as prohibited by the statute.[8] Worden also asserts the district court erred in determining that 29 C.F.R. § 801.4(c) was an invalid regulation as "beyond the scope of authority granted by Congress." For the reasons that follow,

---

[8]Worden does not contend on appeal that SunTrust "inquired concerning the results" under § 2002(2). Although Worden included that allegation in his Complaint, he does not include a claim under that portion of the statute in his Statement of Issues and he makes no argument in that regard on brief. Accordingly, that portion of the statute is not at issue in this appeal and Worden has waived any claim in that regard. *See* Fed. R. App. P. 28(a)(9)(A); *11126 Baltimore Blvd., Inc. v. Prince George's County*, 58 F.3d 988, 993 n.7 (4th Cir. 1995) (en banc).

we affirm the district court judgment in part, reverse that judgment in part and remand for further proceedings.

### 1.    "Accept"

Worden's argument on appeal as to the "accept" prong of his § 2002(2) claim is that "SunTrust admitted that it received information regarding the polygraph results." He makes no other argument that SunTrust "accepted" the polygraph results other than the mere receipt of the results from either law enforcement or himself. Worden does not challenge the district court's finding that SunTrust's receipt of the polygraph results from law enforcement was "passive" and that "Sun-Trust did not request [Worden's] polygraph results from law enforcement." Similarly, Worden does not challenge the district court's finding, at least as to the second polygraph examination, that Worden "unilaterally forced knowledge of the polygraph results upon" SunTrust. With this background in mind, and recognizing neither the EPPA nor its promulgated regulations define the term "accept" for § 2002(2) purposes, we review the district court's judgment in that regard.

The district court determined that under the facts of this case, SunTrust's "mere receipt" of the polygraph results was not "acceptance" for purposes of a § 2002(2) claim. Sun-Trust's "receipt" came either because law enforcement voluntarily announced the results in the presence of SunTrust employees (both examinations) or Worden told SunTrust the results (the second examination). As the district court discussed, this conduct

> does not constitute "acceptance" of the results. The word "accept," in both legal and non-legal contexts, necessarily connoted the ability to decline and requires some action by the person or entity "accepting." Black's Law Dictionary defines "accept" as: "To receive with approval or satisfaction; to receive with intent to retain . . . *Means something more than*

> *to receive*, meaning to adopt, to agree to carry out provisions, to keep and retain." BLACK'S LAW DICTIONARY 12 (5th ed. 1979) (emphasis added).

*Worden*, slip op. at 16.

Worden contended mere receipt of the polygraph results, without more and regardless of the circumstances, constitutes "accept[ance]" for purposes of establishing liability under § 2002(2). In support of this contention, he cited 29 C.F.R. § 801.4(c), a Department of Labor regulation implementing the EPPA, which provides: "The receipt by an employer of information from a polygraph test administered by police authorities pursuant to an investigation is prohibited" by § 2002(2).

The district court disagreed with this argument and rejected the validity of the regulation.

> This Court declines to follow [§ 801.4(c)] that provides an employer's mere "receipt" of the results of a polygraph examination from law enforcement is a violation of the EPPA. Such a regulation goes beyond the authority granted to the DOL by Congress to issue rules and regulations. . . . In essence, such a provision operates to make an employer strictly liable for receiving such information from law enforcement. Such an interpretation is beyond the scope of the authority granted by Congress and is irreconcilable with the express terms of the EPPA.
>
> Clearly, the actual language of the EPPA requires more than the employer's passive receipt of polygraph information from law enforcement. . . .
>
> In this case, the statute expressly uses the word "accept," which has a plain meaning beyond mere receipt. Moreover, the words of the statute surround-

ing "accept," namely "use," "refer to," and "inquire," all connote active participation by an employer. "Receipt" connotes no such active participation, a point made dramatically clear by the circumstances of this case where SunTrust did not request [Worden's] polygraph results from law enforcement, yet would be liable under the DOL's expansive interpretation of the EPPA. When viewed in context of the express language of the statute itself, it is clear that the regulation goes beyond congressional intent. Therefore, [the regulation] goes beyond the scope of authority granted by Congress and will not be followed by the [c]ourt.

*Worden*, slip op. at 16-17, 18-19.

We agree with the district court's analysis. 29 C.F.R. § 801.4(c) is an "interpretive" and not a "legislative" regulation because it merely "explains how a provision operates." *See Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 452 (4th Cir. 2004). As the district court correctly noted, this means § 801.4(c)

can only be upheld "if [it] implement[s] the congressional mandate in a reasonable manner." [*Walton*, 370 F.3d at 452 (citing *Pelissero v. Thompson*, 170 F.3d 442, 446 (4th Cir. 1999))]. In making such a determination, the Court must assess whether the regulation " 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute . . . [and] should not [be] disturb[ed] . . . unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" *Chevron[, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 845 (1984) (citing *United States v. Shimer*, 367 U.S. 374, 383 (1961)).]

*Worden*, slip op. at 17.

In the absence of a definition from Congress in a statute, or a clear congressional intent to the contrary, *see Smith v. United States*, 508 U.S. 223, 228 (1993), we accord words in a statute their "ordinary, contemporary, common meaning." *Walters v. Metropolitan Educ. Enter., Inc.*, 519 U.S. 202, 207 (1997) (internal quotation marks omitted). In addition, the interpretive maxim *noscitur a sociis* states that "a word is known by the company it keeps." *See S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 378 (2006) (internal quotation marks omitted).[9] As the district court correctly concluded, "accept" as defined "means something more than to receive."[10] Furthermore, the inclusion of "accept" in the same statutory phrase as "use," "refer to," and "inquire concerning the results" reflects a statutory intent that "accept" be read in context as carrying similar meaning. Those terms all involve an action by the employer greater than passive receipt. Thus, both its dictionary definition and its context with the adjoining statutory terms under *noscitur a sociis* establish that "accept" means something other than mere unsolicited receipt for § 2002(2) purposes.

As the regulation adopts a mere receipt rule, it is contrary to this plain statutory meaning, and it cannot, as a matter of law, "implement[ ] the congressional mandate in a reasonable

---

[9]The maxim *noscitur a sociis* "is invoked when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." *Id.* (internal quotation marks omitted). It provides that "several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994).

[10]The district court quoted from *Black's Law Dictionary* to support this proposition, and other dictionary definitions also support this conclusion. For example, the definition of "accept" in *Webster's Third New International Dictionary* includes "to receive with consent . . . assent to the receipt of . . . to be able to take or hold." *Webster's Third New Int'l Dictionary* 10-11 (2002).

manner." Accordingly, we hold that the district court did not err in ruling 29 C.F.R. § 801.4(c) invalid.

Because the mere "receipt" of unsolicited polygraph results does not constitute "accept[ance]" under § 2002(2), Worden's § 2002(2) claim cannot succeed under the facts of this case. We thus conclude SunTrust did not "accept" the polygraph results within the intendment of § 2002(2) and therefore the district court did not err in awarding summary judgment to SunTrust as to the "accept" prong of the § 2002(2) claim. Accordingly, we affirm the award of summary judgment as to that part of the § 2002(2) claim.

### 2.   "Use" and "Refer to"

The district court, after correctly determining summary judgment was warranted on the § 2002(3) claim, also awarded summary judgment as to the "use" component of Worden's § 2002(2) claim because it "is completely duplicative of the claim . . . regarding plaintiff's discharge." *Worden*, slip op. at 15. Similarly, in rejecting Worden's "refer to" prong of the § 2002(2) claim, the district court determined "the point is moot because the ultimate outcome would not be any different" because "plaintiff's employment would have been terminated even without knowledge of the polygraph results." *Id.* at 20. With regard to both statutory prongs, the district court misconstrued the operation of subsections (2) and (3) of § 2002 and failed to recognize that the statutory cause of action under § 2002(2) is wholly separate and distinct from the cause of action under § 2002(3).

Under the plain terms of § 2002(2), a § 2002(2) claim is not dependent upon an employer's liability under § 2002(3). Rather, a § 2002(2) claim constitutes an independent basis for asserting the liability of an employer. Although, as a practical matter, the evidence establishing a § 2002(2) or § 2002(3) claim may be substantially the same, liability under § 2002(2) does not require the same proof as would be necessary to

recover under § 2002(3). For example, no proof of an adverse employment action is required under § 2002(2). Instead, the plaintiff need only prove the employer "used" or "referred to" the polygraph examination results. Thus, liability under § 2002(3) is not a condition precedent for a § 2002(2) claim.

How a plaintiff proves a § 2002(2) claim for "use, accept, [or] refer to" as to the results of a polygraph examination, when there is no cognizable claim for an employment action under § 2002(3), may present a formidable burden. This is particularly so as to damages, but it is plain that Congress saw fit to create separate causes of action in §§ 2002(2) and 2002(3), and it was within the authority of Congress to do so. As we have often noted, our judicial task is only to determine the meaning of the statute as passed by Congress, not to question the wisdom of the provision enacted. *Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 308 (4th Cir. 2000). "[A]s long as a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the promulgating entity." *McDaniels v. United States*, 300 F.3d 407, 412 n.2 (4th Cir. 2002) (internal quotation marks omitted).

It is evident that the district court determined it would not recognize Worden's § 2002(2) claim on the "use" or "refer to" prongs only because Worden's § 2002(3) claim had failed. The district court's grant of summary judgment on this part of the § 2002(2) claim was thus grounded in the erroneous conclusion that the § 2002(2) claim was dependent upon the success or failure of Worden's § 2002(3) claim.

Because the district court's rationale for the award of summary judgment on the "use" and "refer to" prongs was based on an incorrect reading of the relationship of § 2002(2) and (3), it erred in granting summary judgment on that portion of Worden's § 2002(2) claim. We therefore reverse the grant of summary judgment as to the "use" and "refer to" portions of Worden's § 2002(2) claim. We also remand to the district

court for further proceedings the part of the § 2002 claim as to whether SunTrust "use[d]" or "refer[red to]" the polygraph results in violation of § 2002(2). As always, the analysis upon remand should focus principally on the plain meaning of the statutory text. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254-55 (1992).[11]

IV.

For the foregoing reasons, we reverse the district court's judgment as to the "use" and "refer to" prongs of Worden's § 2002(2) claim, affirm the award of summary judgment as to the "accept" portion of Worden's § 2002(2) claim and Worden's entire § 2002(3) claim. We remand this case for further proceedings consistent with this opinion as to the portion of the district court's judgment that is reversed.[12]

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

---

[11]"Use" is a broad term. In the context of the EPPA, it appears to mean "to put into practice" or "to employ." *Webster's Third New Int'l Dictionary*, *supra*, at 2523-24. As to Worden's claim that SunTrust "refer[red] to" the polygraph results in violation of the EPPA, "refer" may be defined as "to direct attention to [or] allude." *Id.* at 1907.

Even if the district court finds SunTrust "use[d]" or "refer[red] to" the polygraph examination results in violation of § 2002(2), Worden must prove he suffered damages as a direct result of the violation. Because we have held that Worden would have been fired regardless of the polygraph results, proving economic harm appears unlikely. As to non-economic harms, the district court must determine on remand whether such damages can be proven on these facts.

[12]We do not address any of SunTrust's other arguments that the district court did not reach and to which SunTrust has not separately noted an appeal. We specifically do not address the impact, if any, on a claim of "use" or "refer to" of Worden's voluntary transmittal of the results of the polygraph results to SunTrust.